We are now recording. Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now in session. The Honorable Susan F. Hutchinson presiding. Your Honors, the first case on the docket this morning is 2-22-0256, the people of the state of Illinois, the Plaintiff Appellee v. Eric Alexander Williams, Defendant Appellant. Arguing on behalf of the Mr. Stephen Greenberg. Arguing on behalf of the Appellee, Ms. Pamela S. Wells. Pamela S. Wells All right, good morning, counsel, and good morning, colleagues. Mr. Greenberg, when you are ready, you may proceed. Stephen Greenberg Sure, thank you. Good morning. This is a case where it's rather unique because we're only challenging, there's a juror issue, but I'm only going to address in this argument the quality of the evidence and the quantity of the evidence that was there. And I think it's unusual to have an appeal come before you where someone has been found guilty and they're just challenging the evidence. But in this particular case, there wasn't any identification of Mr. Williams committing a crime. There wasn't any statement from Mr. Williams. There wasn't any forensic evidence to tie Mr. Williams to this young man's death. To prove a drug-induced homicide, the government basically has to prove two things. They have to prove that there was a delivery, some sort of a transaction between two people where someone provided the drugs to the deceased, and that those drugs were at least a proximate cause of the death. They certainly don't have to be the only cause, but they have to be the ever possessed any drugs, possessed them personally, possessed them to sell to somebody. There's no proof of other crimes evidence that he was a drug dealer or anything like that. Well, can you explain? It's clear that there was a transaction or a relationship between the victim and your client, correct? It is, I would say, circumstantially, there's evidence that there was a relationship. There was a phone that was listed in the victim's phone as EEE. And when they called that phone a month later or so, or three weeks later, my client responded and he was in possession of that phone. So I would say that's a fairly good circumstantial. Yes. And it was a withdrawal of $300 for the transaction, which maps the 150 and 150 that's in the text messaging, correct? Well, there was a withdrawal of 300 and there was a 150 and 150 in a text message to that phone. Yes. And the expert testimony was that the 150 and 150 was 150 for heroin, 150 for cocaine. That was what the expert said. And the mother said that he said he owed a debt to somebody. Yes. But I don't think you could convict someone just based on an expert saying, I think this is what this meant at that time. The problem here is when they did that second transaction, they did essentially a recreation of the event. So let's call it what it was. You're essentially asking us to reweigh the evidence, correct? I am asking you to reweigh the evidence, which I think- That's not our role. Well, it is your role, not to necessarily reweigh it, but to determine- The sufficiency of the evidence is the question. Yes. Yes. So when you look at it, you're not, as the first district appellate court said, in the Powell case, it's not a rubber stamp situation. Sometimes evidence is unreasonable, improbable, and unsatisfactory, and the appellate court can look at it. Now, you could call it a reweighing of the evidence. You can call it a review of the evidence. But the fact is that when they did this science experiment in January, Justice, and they recreated the event, again, there was no drug transaction. Mr. Williams showed up with no drugs. And he also fled the scene, resulted in a crash. Right. And the phones are both recovered. He's got a drop phone, essentially, and the testimony was it's very common for drug dealers to have a drop phone. Correct. Correct. I'm not saying that there's not circumstantial evidence that he may have been a drug dealer. But when you recreate the crime three weeks later, and he has no drugs, I mean, they said, we want to purchase drugs from you, just like this guy did. And all of the evidence is that Williams showed up with no drugs, which makes it just as probable that the first transaction, if it was Williams, was to pay the debt, as the mother said. In other words, what they've got here is they've got a deceased, and it's very unfortunate. And there was no testimony about this second transaction. The victim is deceased. The purpose of that arrival at that location? The officers from Wonder Lake and the Rockford officers and the state's attorney's office in McHenry County all tried to recreate the deal. They did send the exact same message as had been sent for the first deal. They did the meeting. So they wanted to purchase drugs. The whole purpose was, okay, we're going to have you sell us drugs, just like you did with Mr. Garnick. And then we're going to have this evidence. What did he mean by get this stuff out of my car? That text message? Judge, it wasn't a text message. It was a statement. They searched his car. They didn't find anything. So I have no idea. They say he made that statement. They don't have any of it on body cam. They say he made that statement. But let's say that it meant something was in his car. It wasn't drugs. They searched his car. They searched the route. They went over where it had been. They said, well, maybe he ingested it. They have no evidence he ingested any drugs. I mean, he said get this stuff out of my car. I don't know what he was referring to. He didn't testify to it. The record is silent after that. They tried to infer that he meant get the drugs out of my car. But then if he meant get the drugs out of my car, that goes against any argument that he threw the drugs, certainly. And where are the drugs that were in his car? Mr. Greenberg, what did they get out of his car? A phone. Okay. Well, two phones, right? Two phones. So that was it? That was it. They got no drugs. There's no recovery of drugs at any time from Mr. Williams. I mean, I'm not talking about what did they get? Other than two phones, did they get clothes? Did they get food? What did they get out of his car? The only thing that was introduced into evidence that they got out of his car, my recollection was the two phones. Okay. So you've got a jury looking at that. They got two phones. One that's, as Justice Burkett said, a drop phone. And they can't find drugs. They haven't determined that he ingested. But the jury has a right to consider that statement however they wish to and get the stuff out of my car. It may not, but they didn't find anything. That's the problem with it. If I say right now, I killed Jimmy Hoffa and he's buried under the Lions football stadium and they dig up the stadium because I think that's where they used to think he was buried. And they dig up the stadium and they don't find Jimmy Hoffa. Who cares what I said? Whether Mr. Williams is a drug dealer, he's not on trial for being a drug dealer. He's on trial for selling the drugs that caused the death to this young man. And you don't have any witness who saw the transaction. They have a video and the officer from McHenry said, you cannot identify who's in this video. You cannot say with any conclusiveness that it's the same car. It looks similar, but you can't say it's the same car. You've got Mr. Darnick's wife bringing over a satchel full of drug paraphernalia and so forth. You've got drugs found in his room a month after he died. You've got money found in his room that's different than the money that his mother gave him. You've got, you know, the state makes a big deal about how he interacted with other people in the two days after he went to Rockford and they all denied selling him drugs or providing drugs to him. So they couldn't have provided drugs to him. Mr. Greenberg, when they testified, was there any history between those people who interacted and Mr. Darnick prior to his, wherever he had been before? I'm sorry, when who testified? When those people that he interacted with testified and when his wife testified, was there any information or any indication that they had brought drugs to him before? His wife testified that she brought him a container that contained, that he called her up when he got back from rehab and he said, I need these two things that are at the house. Can you cooler? I'm thinking of it like a lunch cooler you would take. I wasn't a trial lawyer, so I didn't see the actual cooler itself, but a small little cooler. And it apparently had pipes and a bong and stuff to ingest cocaine and heroin in it. And then a separate purse she brought him that she said she did not look inside and she did not know whether it contained drugs and she had no idea why he had asked her to bring that over. And she was the lady who used to drive him to purchase drugs and she did not identify Mr. Williams or anything about Mr. Williams as being someone who her husband had bought drugs from in the past. Well, that would then go to the issue of he wasn't paying any debt to Mr. Williams because she had never driven him there before. It could be inferred from that testimony that this was a new transaction that he generated. Or it could be inferred that he owed someone associated with Mr. Williams because it's also these phones get passed around. One person doesn't have the so-called ordering phone for 24 hours. Different people have the phone at different times. So it could also be inferred that it was a debt owned to whatever organization controlled this phone. Was that testified to in the trial? That the phones would get passed around. I believe so. All right. Well, that being the case, the jury now has additional information that he has sold drugs in the past and that could be inferred that he sold drugs to Mr. Darnick early in December or late in December. Pardon me. Well, and that's where I guess we differ because it's not just can you infer things, it's a proof beyond a reasonable doubt. So you can't in a criminal case, you shouldn't be able to say that just because there's there's smoke, you know, there's fire in these cases. I mean, that's not how it works. The fact remains that there is circumstantial evidence that Williams may have been a drug dealer, but there is zero evidence that he sold drugs to Darnick. There are messages that were testified to from the 22nd where the defendant and Mr. Darnick set up a transaction. Well, that's to buy $150 worth of heroin and $150 worth of cocaine. Well, that is one interpretation and then there's some others. The reasonable inference, that's a reasonable inference, and we must credit that reasonable inference when we look at the evidence in a light most favorable to the state. Correct. But then the problem is that has to be balanced against a couple of other things, that the lack of a drug transaction on the science experiment. And they still don't know that they have no way of showing that any drugs that were sold at that time are the drugs that caused his death. Well, we know heroin causes death. We know heroin causes death, but we don't know that that heroin causes death by any stretch. You know, it's in federal court sometimes they'll try cases and they'll have someone and they won't actually have the drugs and it'll be a conspiracy and they'll have conversations and so forth. This is not a conspiracy. This is a delivery. It's a delivery. And to prove a delivery, you have to have some credible evidence. You can't just say, well, on another occasion, he had the phone and to that phone there were messages. There's nothing showing that Mr. Williams was the person who was there on the day of the delivery. There's nothing. No evidence at all. Counsel, what other opportunities did Mr. Darnick have during this three-day period to obtain drugs? You mentioned you think the wife might've delivered. What specific evidence points to the wife delivering drugs or any other opportunity he may have had to obtain from anybody else? The evidence that points to the wife is that they were estranged and weren't getting along. She knew he had just gotten out of rehab. She brought him his bag of drug paraphernalia. She brought him this other container. They found in the room where he died, a dollar bill, which he had to get from somewhere other than the $300 that his mother had gotten out. They said he had no money. They found heroin rolled up in the dollar bill, which was how his wife said that he would ingest drugs. They have the other people who took him with them during the day who did not all testify, by the way. All of these other people, there was testimony. He was left at home for four or five hours while everyone else in the family went to a party. You don't know who else may have come there. With all of that, for instance, with the wife, there's just as much evidence, if not more evidence, that she brought the stuff than Mr. Williams. We know that she brought drug stuff to him. If she knew he just got out of rehab and she loved him and all that, why would she bring this stuff to him? I see my hourglass is closed. Thank you. I'll take the rebuttal. Thank you. All right. Ms. Wells, you may proceed. Your honors, counsel, may it please the court. The real focus here is the delivery. I think that can be broken down into four aspects. The drugs were purchased in Rockford. The prosecution eliminated his access to a car, money, and other drugs in the days leading up to his death. We're only talking about a three-day time period. I want to talk a little bit about the wife, setting up a drug transaction. That's what the expert testified to. That's what the phone records show. Those phone records, that communication starts after Jacqueline Darnick drops off his items. We also have the expert testifying that drug addicts don't store their supply. So, after Jacqueline Darnick leaves is when he starts attempting to purchase drugs. He would have no reason to go through the elaborate ruse that he did with his mother and get, you know, it's a drug debt and can you give me money and give me a ride to Rockford, if he had this store of drugs that Jacqueline Darnick had just delivered to him. He starts the communication after she leaves trying to get drugs. Ms. Wells, didn't Mr. Darnick mention this drug debt to his mother even before any of this started? Didn't he say something about it sooner or was it only afterwards? My recollection of the record, it was after Jacqueline Darnick left. That it was on the 21st, after Jacqueline Darnick left, that he requested the ride to Rockford. The text messages then, even the defendant agrees that this is a reasonable inference that can be drawn, that the 150 and 150 was setting up a drug deal. So, if that is in fact a reasonable inference that this was a drug deal that was being set up, he was given the money, he went to Rockford, this is the one opportunity during that three-day time period that he could purchase drugs. Detective Fields was identified and accepted as an expert at trial. He testified to his interpretation of that messaging. Next, we have the defendant was EEE, the person that did the drug, the buy. He's in a black Dodge Charger. The detective testified that he drives that Charger daily. That's the car that Darnick is seen getting out of on the 22nd. We also have that during the buy bust, the phone for EEE was found on defendant. Now, the issue with him being empty-handed when he stopped, we know he fled consciousness of guilt. We know he ends up in a time. We don't know if he ingested the drugs. He may have or may not have, but that was for the jury to decide. We don't know if he threw out the drugs in the parking lot and during the course of the flight. That was for the jury to determine, but the inference was, get this stuff out of my car. He had the drugs at that point, but that's not the delivery we need to be worried about. The delivery we're asking about is the 22nd when Darnick, the victim, was taken to Rockford. Then the final establishment of the three elements of this offense was whether the victim with heroin in his system and heroin in his room. I think that when you're looking at, was this the heroin that caused the death? We have to go back to near being the contributing causation. It doesn't have to be the sole causation. We've eliminated any other source of drugs during the testimony. What about the four hours on the 23rd when he was home alone with his youngest daughter? He was taking care of his daughter and there is absolutely no evidence that anyone else came to the house. There's nothing in his text messaging, the recovered phone that he had communication with anybody setting up a subsequent drug deal. While he was in contact or communication with anybody who would have been dealing drugs. That was evidence that was before the jury that he had been alone for these couple of hours. That was an inference for them to determine whether he had an opportunity to get drugs during that time period. They obviously found that he didn't. That the only time that he had access to drugs was during this trip to Rockford. They determined that the person he met with was Williams. Those are reasonable inferences. When you go back to the standard that the court has to review, Justice Burkett, you hit the nail on the head. Defendant is essentially asking you to reweigh the evidence. That is not your role as you clearly understood. When you look at the fact that he didn't start trying to purchase drugs until after Jackie Darnick dropped off his items. That also goes to these are the drugs. That is a reasonable inference that the drugs that he got on the 22nd were the drugs that he ingested, were the drugs that caused his death. We have both the delivery and the causation established. Counsel has not addressed the jury issue. If your honors have any questions, I was very thorough about that in my brief. If your honors have any questions on that or on the delivery and the causation issue, I would be happy to answer those. In summary, those four elements are really the focus here. The reasonable inferences were made by the jury. Did anybody testify? I know Mrs. Darnick didn't testify. Did anyone testify that they knew what was in that satchel or that purse before it was delivered to him? No. She said she didn't go through it. She would have been the only one that had contact with it because drug users don't store their source, their drugs. Stockpilers store it. He had just gotten back from rehab and he attempts to purchase after Jackie Darnick delivers the items, which is why we believe it's a reasonable inference that the only drugs he had access to were the ones he purchased on the 22nd. He would have had no need to purchase drugs and go through the elaborate machinations that he did with his mother to get to Rockford to purchase more drugs if he had any in the items that Mrs. Darnick delivered. Where exactly was that dollar with the heroin inside found? It was found in a drawer in a box all folded up. When counsel refers to money being found, that is the only money that the people are aware of that was recovered in his room was that dollar bill. I don't recall the evidence showing that it was any other drugs, but it was tucked into this box that when the mother went in, I believe it was February 10th of the following year, so just a couple months later, she was cleaning out the room in which he had died. She found that dollar bill with the powdery substance and immediately turned it over to the detective. That was what was determined to be you know, explained the 150 and 150, the heroin and cocaine, they kind of go together. One brings you up, one brings you down. That was stored in the way Mrs. Darnick had testified. He regularly used his drugs. He would wrap it up in a dollar bill and then use it incrementally throughout his time period of having it. Do we know what, how many times had he been in rehab? Was this the first time or were there other times before this? If your honor, I don't, I don't recall. I, I, I apologize. I know this was a lengthy stay and he had just gotten back. I, I, okay. Counsel, is there anything in the record indicating his familiarity or unfamiliarity with the, the mom's house where he was left alone for four to five hours or anything? There is justice. He, um, was not familiar with Wonder Lake. He had never lived in Wonder Lake. That is why specifically they had, um, had him staying in Wonder Lake. He had previously lived in Belvedere with his wife. His mom had moved to Wonder Lake after he had moved out of the, family home. And, um, so he had been living in Belvedere and his, uh, wife testified that his purchasing of drugs was always in Rockford. So the, the family testified he didn't know anyone in Wonder Lake other than the family members, um, who testified and, and indicated they, that they had been with him and that he had not, or that he had not gotten drugs from them, which the jury was able to weigh their credibility. All right. Any other questions, Justices? No. Thank you. Thank you. Thank you, Your Honors. Thank you, Ms. Wells. All right. Mr. Greenberg, you have time for rebuttals. Thank you, Justice. Uh, first of all, the 150 and 150 that, that we keep talking about, the detective testified that, that that was the first time, uh, he had seen that phrase used like that. That was his estimation of what it was, but he couldn't identify any other time where he saw anything like that. Um, the flight, uh, a lot of people flee from police. Um, they say that it's, you know, consciousness of guilt. I don't know that it's consciousness of guilt that he was going to be delivering drugs on any occasion. Uh, he could have thought that the police were converging on him for, for any number of other reasons or other things. The fact is that, and what's important here is that no one saw him throw anything from the car. There's no evidence he ingested anything. You know, I keep hearing this and they kept saying it during the trial. We don't know if he ingested anything. How was that proof? We don't know is not proof. And that's part of the problem. We don't know if he delivered drugs. We don't know if he got rid of drugs on January 7th. We don't know if Darnik really was just going to pay off a debt. We don't know if there were drugs in the purse. We don't know is not proof beyond a reasonable doubt. And what they did in this case quite cleverly is they took everything and they said, well, we're going to take all these. We don't know. And because we don't know, you should infer that this is what happened from the, we don't know. And that's the big problem here. So, uh, you know, we don't know if he had stuff in the car or not. We don't know what happened, but somebody died. And so someone has to pay for it. And, and, and that's the problem I have with this case. If they had a scintilla of evidence, if they had a fingerprint, if they had DNA on packaging, if they had a video that showed Mr. Williams, if they could positively identify a card, say it was Mr. Williams. If someone could say that they ever saw Mr. Williams and Mr. Darnik together at any time before, during they'd have something. They don't have any of that here. And that's really the problem with this case is that there is no evidence. And from the absence of evidence, they said, well, because we did this other transaction. And when they sought to admit 404B evidence, the January 7th transaction, the reason they sought to admit it was because they said it was proof of a drug deal, but there was no drug deal on January 7th. And there were no drugs on January 7th. And there was no excessive amount of money on January 7th. There were two phones and that was it. So, so that's the problem is that they've said, we don't have any evidence that this is the guy, but he can't disprove it. That's really what they did here. And that's the problem. Okay. Mr. Greenberg, you said you weren't trial attorney. And in fact, you were not, but everything that you've just argued now essentially was argued by the defense attorney at that, at that trial, correct? Right. Correct. Maybe not as fervently, but it certainly was the defense argument. And they still decided that the, if you put the circumstantial evidence into a puzzle, so to speak, that there was a drug transaction on December 22nd and how, you know, how do we get around that? And they were not coming to arrest me. I hope. I don't think so. It makes for a heck of a video. The so what you've said is how do we get around it? I had another case out of McHenry County probably 10 years ago, where this court actually reversed a bench trial finding of guilty. The problem is that the jury's able to weigh that, but sometimes the jury gets it wrong. And that's why we have appeals. And that's why we can still ask the appellate court to look at it. And the jury heard all of this and they're human beings. They're not lawyers. They don't look at things as lawyers look at things. They looked at it. I'm sure. And I'm sure they felt very bad for the mother. I'm sure they felt very bad for, for the man's children and who were out, you know, are now without a father and all of that. And they ignored the fact there's no evidence. I mean, I don't know. Mr. Greenberg, you keep saying there's no evidence and we've gone through this now. The only reasonable inference from all of the evidence is that there was a relationship between your client and the deceased, Mr. Darnack, and that he had supplied them drugs. And your argument is that maybe that's a fair inference, but not for that date. That's essentially what you're saying, right? My, my argument is that there's a fair inference that they may have known each other, or at least my client was using the same phone that Mr. Darnack knew someone was associated with him, but that's not knowing somebody isn't enough. You still have no evidence. 150 and 150 equals 300. Correct. And the evidence is pretty clear that he had stuff. He wanted to get the stuff out of my car on January 7th. Correct. The transactions are, or at least a fair inference is that they were, it was arranging a drug transaction. That is what they want, the state wants, but there is no drug transaction. See, the problem is there is clearly heroin because he died from heroin overdose. There is no doubt that the man got drugs somewhere, but again, the problem is that you've just got a phone, like convict the phone. You could convict the phone in this case, if you want of, of engaging in a discussion about selling drugs, but you don't, where can you have a case where you could say it's proof beyond a reasonable doubt for a drug transaction where you don't see a drug transaction? No one identifies the defendant as being involved in the drug transaction. There are no drugs found on the defendant. Subsequently, no one comes and says he's a drug dealer. You've got this one fact, that's the problem. Homicides are proven all the time when the weapon is never recovered. Correct. Happens all the time. And why is drug-induced homicide different? The drug is the weapon. Right. It kills. Well, it was, I mean, it was ingested, so it can't be recovered. That makes sense, but in a homicide case, you're going to have an conversation. This is the person that is on the video camera walking around the corner just before the gunshots rang out and seen running from the scene. You're going to have something to connect them to the crime. Here, you have a phone and a message. And from that, they've said, well, here's we think happened, which is fine. The whole case is a closing argument. It's not evidence. That's the problem. It's not evidence of what happened. It's just, this is what we want you to think happened, but we don't have any evidence. Those are called inferences. The only inference you have is the phone. That's the only inference in the case. And you have the flight, you have the defendant's statement, get the stuff out of my car, but that's a different, so that's 404B evidence. You can't use the 404B evidence to convict them. And if you honestly look at the 404B evidence, it's more supportive of no transaction because there is no transaction, there's no drugs and so forth. I mean, we're going to, you know, I was post-trial. Yeah. And you did not raise the, just to turn to the other issue that was raised, the ineffective position was not raised in your post-trial motion, correct? The jury selection issue was not, I didn't do the post-trial motion. I argued it. What had happened was the judge was retiring in two days and reappeared that day and the motion covered what I thought were the main points. So we went ahead at that point. Especially, and I will tell you that, especially given the court's comments weren't indicated that, you know, had it been a bench trial, it likely would have been a different result. I felt that Mr. Williams was better off being sentenced by that court than the young male. And I would not have juried this case. And that's exactly why you took a bench trial 10 years ago, because judges are different than a jury. Right. Right. That's also why there's appellate review of cases. And I think when you guys read this record, you know, and take a look at it, you're going to see that if we go, if this is enough, and I know drug-induced is a horrific thing. I know that they've got terrible problems with it. And I understand the penalties and all that, but they don't come any thinner than this. And if we start saying this is okay, then we're really going off the cliff. All right. Justices, do you have any other questions that you'd like to ask Mr. Greenberg? Thank you, Mr. Greenberg. I don't have either. Thank you, counsel, both for your arguments here today. We will deliver a decision shortly. And at this time, everybody on the screen other than my colleagues are dismissed. Thank you. Thank you, justices.